Filed 7/29/15  P. v. Luna CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE JUAN LUNA,<br><br>    Defendant and Appellant. | H040191<br>(Monterey County<br>Super. Ct. No. SS122246A) |

Defendant Jose Juan Luna was sentenced to 79 years in prison after a jury found him guilty of five counts of committing lewd and lascivious acts upon a child under the age of 14 (Pen. Code, § 288, subd. (a)),[1] eight counts of committing forcible oral copulation (§ 288a, subd. (c)(2)(A)), two counts of committing lewd and lascivious acts upon a child between the ages of 14 and 15 (§ 288, subd. (c)(1)), six counts of committing unlawful sexual intercourse with a minor more than three years younger than him (§ 261.5, subd. (c)), and one count of attempted unlawful sexual intercourse with a minor more than three years younger than him (§§ 664, 261.5, subd. (c)).  All of the acts were perpetrated against his stepdaughter (victim).

On appeal, defendant argues that the trial court's answer to the jury's question about an interview victim had with a female employee at the Bates-Eldredge Clinic (hereafter referred to as the "Bates interview") was prejudicially misleading.  Defendant also claims that the court abused its discretion when it denied his motion for a new trial

_____

[1] Unspecified statutory references are to the Penal Code.

after victim recanted her testimony following the jury's verdict. Defendant also insists that the evidence is insufficient to support one of his convictions for committing forcible oral copulation. We reject defendant's claims of error with the exception that we agree that one of his convictions for forcible oral copulation (count 7) is supported by insufficient evidence. We reverse the judgment and remand to the trial court to strike defendant's conviction for count 7 and resentence defendant on the remaining counts.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Information

On January 28, 2013, the Monterey County district attorney's office filed an information charging defendant with five counts of committing lewd and lascivious acts upon a child under the age of 14 (§ 288, subd. (a)), eight counts of committing forcible oral copulation (§ 288a, subd. (c)(2)(A)), two counts of committing lewd and lascivious acts upon a child between the ages of 14 and 15 (§ 288, subd. (c)(1)), six counts of committing unlawful sexual intercourse with a minor more than three years younger than defendant (§ 261.5, subd. (c)), one count of attempted unlawful sexual intercourse with a minor more than three years younger than defendant (§§ 664, 261.5, subd. (c)), and one misdemeanor count of child molestation (§ 647.6, subd. (a)(1)). It was further alleged that defendant had a prior serious felony and a prior strike conviction under sections 1170.12, subdivision (c)(1) and 667, subdivision (a)(1).

Defendant pleaded not guilty to all of the charges. On July 8, 2013, the trial court dismissed the misdemeanor count of child molestation. Jury trial commenced that same day.

### The Jury Trial

**Victim's Testimony**

Victim (born December 1994) had lived with her mother (mother) and her stepfather (defendant) since she was eight years old. When victim was 13 years old, she

moved with her family to a trailer where she had her own room. After the move, victim's relationship with defendant changed. Defendant became physical with victim, touching her breasts and kissing her on the lips. These incidents started between the summer of 2008 and December of 2008. Victim said that defendant would make advances toward her either in the living room or in the kitchen. Mother was oftentimes in the house, but would be preoccupied with other things in another room, or would be taking a shower. Victim testified that sometimes when mother took showers with defendant, he would finish his shower earlier than mother and would then come out and make advances toward victim.

Victim said she was 13 years old the first time defendant had intercourse with her. Defendant entered victim's room and undressed her. Victim resisted at first, but she eventually relented to defendant's advances. Victim said she was not sure why she stopped resisting.

Afterwards, victim did not tell mother about the incident, because she was not sure how mother would react. Victim said she hated herself for a while, because she had been with mother's husband.

After the first incident, victim did not have intercourse with defendant again until she was 14 years old. Victim said that defendant would have intercourse with her three or four times in a month. However, they did not have intercourse every month. She estimated that over the course of a year, defendant had intercourse with her approximately 10 to 11 times between 2008 and 2009 (when victim was in eighth grade) and between "fall 2009 to May 2010" (when victim was in ninth grade). She could not recall the specific months the incidents occurred, only that they occurred somewhat regularly.

3

Victim said defendant had intercourse with her at the same frequency (10 or 11 times a year) when she was in the tenth grade, but the frequency decreased when she was in the eleventh grade after she had a pregnancy scare.

Victim said defendant would sometimes have her orally copulate him before they had intercourse. However, she also said there were times when she would orally copulate him even when they did not have intercourse. Victim said she orally copulated defendant the first time they had intercourse in 2008, when she was 13 years old. Between the ages of 14 and 15, victim said she orally copulated defendant approximately seven to eight times. Between 2010 and 2011 and 2011 and 2012, victim said she orally copulated defendant with the same frequency. Victim said she would resist defendant's advances by pulling her head back, but he would pull her head down toward his penis.

Defendant was arrested following an incident that occurred on the evening of November 19, 2012. Earlier that day, victim had gone out with her family, including defendant, to a local restaurant. After dinner, victim returned home with defendant and mother. She went to her room and noticed defendant was outside, looking at her through her window. Victim opened the window, and defendant leaned in. Victim said defendant began kissing her. After a few minutes, defendant climbed into victim's room. Defendant undressed victim, removing all of her clothes, and began taking off his pants.

Shortly thereafter, victim heard a door open. She turned around and saw mother. Victim heard mother say to defendant, "How could you?" Victim said that she heard defendant go out the window, and she heard the sound of defendant's belt buckle hitting against the glass as he exited. Mother then turned to victim, asking her, "How could you?" Defendant reentered the house through the door next to the carport, and mother again confronted him. Victim got dressed, and she overheard mother and defendant yelling at each other.

4

Victim eventually left the house with mother, grandmother, and uncle, to go to her grandmother's house. There, she was interviewed by several police officers. She also spoke to officers at the police station. The officers were male, and victim said she felt uncomfortable speaking to them. She told one of the officers that she had sex with defendant a total of three times. Victim explained that she was scared and was still in shock.

Following the November 2012 incident, victim moved out of mother's home. She did not believe mother wanted to live with her. Victim said she had only spoken with mother three or four times after that incident.

Victim testified about an interview she had with a female employee at the Bates-Eldredge Clinic about her relationship with defendant. She could not recall if, during the interview, she told the employee that she had sex with defendant in the living room of the home. However, she recalled telling the employee at the Bates clinic about her pregnancy scare. She could not recall if she told the employee at the Bates clinic that defendant would come out of the shower and have sex with her.

**Mother's Testimony**

Mother had been married to defendant for about 10 years and had known him for about 20 years. Victim was not defendant's biological daughter. Mother had four other children with defendant.

Mother recalled the incident that occurred in November 2012. She remembered that defendant had stepped outside that night after they returned from the restaurant. Mother went to look for defendant. She opened the door to victim's room and saw her half-naked. Mother said victim was wearing shorts but was not wearing a top or a bra. Mother said she went to the window and saw defendant standing on the ladder.

5

This testimony contradicted mother's earlier statements. In a prior interview with detectives, mother had initially told officers that defendant was standing in victim's room and that victim was naked. She had also told the 911 operator that victim was naked.

Mother said that her daughter appeared "fine" afterwards. Victim also told mother that the situation was not what it appeared and that nothing had transpired between herself and defendant.

At trial, mother insisted that defendant had little time alone with her children. She and defendant always took showers together, except when defendant was not at home, and defendant never left the shower early.

**Defendant's Testimony**

Defendant testified on his own behalf and explained what happened the night of November 19, 2012. Defendant said he watched a football game at a restaurant with his family earlier that day. Victim had become angry with him that night.

After the family returned home, defendant stepped outside and smoked a cigarette. Defendant said that he had previously situated a ladder underneath victim's room, because the family had been locked out of the trailer and needed a way to enter the house. While outside, he saw victim's bedroom light turn on, so he went up on the ladder and knocked on her window. Defendant said he wanted to apologize to victim for upsetting her earlier that evening. Defendant said he opened the window and went up a few steps so he could be eye level with victim. Defendant was unable to see anything other than victim's face, since she was close to the window. Defendant did not know if victim was dressed or undressed. Defendant said he talked to victim for a few minutes, until mother walked in and began shouting. Defendant said his belt buckle might have hit the ladder at some point, because the ladder was old and unstable.

6

Afterwards, defendant said he tried to calm the situation down, but failed. Mother called defendant's mother, and he went home with her. Defendant was arrested the following morning.

Defendant insisted that he never had intercourse with victim and denied ever engaging in inappropriate behavior with her. Defendant maintained that he treated victim like she was his own daughter. Defendant said he always took showers with mother, and never got out of the shower earlier than she did. Defendant denied ever being alone with victim.

Defendant said he had problems with victim. Prior to the November 2012 incident, victim had found her biological father on Facebook. Victim went to defendant and mother and asked if she could develop a relationship with her biological father. Defendant and mother both said no, and victim became upset. Victim said she wanted to move in with her grandmother, but defendant and mother refused to let her do so.

*The Jury Deliberations*

Following closing arguments, the court gave the jury instructions and the jury began its deliberations. At one point, the jury asked the court in a written question, "The Bates Interview--its [*sic*] referenced several times but we were not provided any information--would this interview be relative [*sic*]?"

The court discussed the question with counsel. Thereafter, the court answered the jury's question, explaining: "That question was asked, probably, by you early on, and both the attorneys felt there wasn't anything relevant in there, or they would have brought it before us. So it's not in evidence, and you can't consider that or speculate what's in that."

*The Verdict, Motion for New Trial, and Sentencing*

On July 16, 2013, the jury returned its verdict, finding defendant guilty of all 22 counts as charged.

7

The following month, defendant's trial counsel submitted a motion for a new trial. Victim had come forward with a letter recanting her accusations against defendant. The one-page handwritten letter stated that victim had "lied in open court," she never had intercourse with defendant, and defendant never touched her inappropriately. Victim explained that she had lied because she was angry at defendant and mother because they would not let her see or talk to her biological father.

On September 12, 2013, the court held a hearing on the new trial motion. Victim was present at the hearing but was not called to testify. Based on its evaluation of the recantation letter, the court asserted that it did not find the letter credible and denied the motion for a new trial.

Thereafter, the court sentenced defendant to a total term of 79 years in prison.[2] The trial court imposed a $6,020 restitution fund fine under section 1202.4, subdivision (b), a $1,230 fine under section 290.3, a $900 court operations assessment fee under section 1465.8, subdivision (a)(1), and a $660 court facilities assessment under Government Code section 70373. The trial court also ordered defendant to pay $1,950 to the Victim Compensation and Government Claims Board. Defendant was awarded 369 days of custody credit, consisting of 247 days actual days and 122 days conduct credit.

### DISCUSSION

Defendant raises three arguments on appeal: (1) count 7, forcible oral copulation (§ 288a, subd. (c)(2)(A)) committed between August 1, 2008 and May 30, 2009, is not supported by sufficient evidence, (2) the trial court misled the jury in its response to its

---

[2] The sentence consisted of: the mid-term of six years for count 6, plus a lower term of three years each for counts 7, 10, 11, 14, 15, 18, and 19; and one-third the mid-term of two years for counts 1, 2, 3, 4, and 5. The total sentence was then doubled, because defendant had a prior strike conviction. An additional five years was added for defendant's prior serious felony conviction. A concurrent three-year term was imposed for the remaining counts (counts 8, 9, 12, 13, 16, 17, 20, 21, and 22).

8

question about the Bates interview, and (3) the trial court abused its discretion when it denied defendant's new trial motion without hearing testimony from victim.

1. *Count 7*:  *Forcible Oral Copulation Between August 1, 2008 and May 30, 2009*

Defendant was convicted of count 7, forcible oral copulation between August 1, 2008 and May 30, 2009.  He argues insufficient evidence supports this conviction.  As we explain below, we agree.

### a. **Legal Framework and Standard of Review**

Section 288a, subdivision (c)(2)(A) provides that:  "Any person who commits an act of oral copulation when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person shall be punished by imprisonment in the state prison for three, six, or eight years."  Oral copulation is "the act of copulating the mouth of one person with the sexual organ or anus of another person."  (§ 288a, subd. (a).)

The applicable standard of review to determine whether sufficient evidence supports the juvenile court's findings is well settled.  "In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves.  Rather, we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence--evidence that is reasonable, credible and of solid value--such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'  [Citations.]  We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence."  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129; see also *People v. Meza* (1995) 38 Cal.App.4th 1741, 1745.)

In child molestation cases, "generic testimony" is sometimes presented, in which a victim describes multiple incidents that are not differentiated by dates, times, or places.

9

Such testimony may be presented in cases where the molester has resided in the victim's home and molested the victim repeatedly, so that "[a] young victim . . . may have no practical way of recollecting, reconstructing, distinguishing or identifying by 'specific incidents or dates' all or even any such incidents." (*People v. Jones* (1990) 51 Cal.3d 294, 305 (*Jones*).) This can create certain issues of proof in molestation cases. In *Jones*, the court reconciled the tensions between a defendant's due process rights with society's need "to assure that the resident child molester is not immunized from substantial criminal liability merely because he has repeatedly molested his victim over an extended period of time." (*Ibid.*) It held that generic testimony can support a conviction if certain minimum requirements are met.

"The victim, of course, must describe *the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g., lewd conduct, intercourse, oral copulation or sodomy). Moreover, the victim must describe the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping'). Finally, the victim must be able to describe *the general time period* in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us'), to assure the acts were committed within the applicable limitation period." (*Jones*, *supra*, 51 Cal.3d at p. 316.)

b. **Defendant's Conviction**

Defendant argues there is insufficient evidence to support his conviction for count 7, which alleged a count of forcible oral copulation in violation of section 288a, subdivision (c)(2)(A) occurred between August 1, 2008 and May 30, 2009.[3]

_____

[3] The date range for the offense alleged in count 7 corresponded with victim's grade in school, not her age. However, at trial, victim testified about incidents that (continued)

Victim was born in December 1994 and turned 14 years old in December 2008. Count 6 alleged a violation of section 288a, subdivision (c)(2)(A) occurred when victim was 13 years old. Accordingly, the time period alleged in count 6 overlaps slightly with the time period alleged in count 7, since victim would have been 13 years old between August 1, 2008, and her birthday in December 2008.

Victim provided specific testimony regarding only one incident of forcible oral copulation. Pertinent here, victim testified that she was 13 years old when she first had intercourse with defendant and that she orally copulated him at that time.

Defendant argues that the evidence establishing that victim was forced to orally copulate him when she was 13 years old can only support his conviction for count 6. Because this one act cannot support two convictions, in order for the conviction for count 7 to stand, there must be sufficient evidence that defendant also forced victim to orally copulate him at least once between December 2008 and May 2009.[4] We agree with defendant that no such evidence exists in the record.

Victim testified that she orally copulated defendant approximately seven to eight times between the ages of 14 and 15. However, she did not identify which month each act occurred. Furthermore, unlike the victim in *Jones*, victim did not specifically testify that forcible oral copulation occurred at regular intervals, such as once or twice a month. Victim asserted that she would sometimes orally copulate defendant before intercourse but acknowledged there were, at times, gaps of several months when she did not have intercourse with defendant.

occurred when she was a certain age. Since victim's birthday is in December, her age (i.e., when she was going from age 13 to 14) does not neatly correspond with her grade in school (i.e., when she was going from eighth to ninth grade).

[4] This date range would take out of consideration the time period that alleged during which victim was 13 years old. At trial, victim asserted that she only had sex with defendant and orally copulated him one time when she was 13 years old.

11

Victim's generic testimony regarding the forcible oral copulation is not sufficient evidence to support count 7, because count 7 represents a *specific* time period of August 1, 2008 through May 30, 2009. Under *Jones*, victim's testimony would be sufficient to support a conviction for forcible oral copulation when victim was between 14 and 15 years old, roughly between December 2008 and December 2009. However, without evidence that an additional act of forcible oral copulation occurred between the distinct time period charged, a determination that at least *one* act took place during that specified period would be based purely on speculation.[5] Speculation is not sufficient evidence. (*People v. Cluff* (2001) 87 Cal.App.4th 991, 1002.) All of the aforementioned acts could have occurred after May 2009.

Victim's testimony did not describe with sufficient certainty that forcible oral copulation occurred during the time frame alleged in count 7. Therefore, this conviction cannot stand.

2. *Bates Interview*

Next, defendant claims the court prejudicially erred when it told the jury that the Bates interview was not relevant in response to the jury's question on the matter.

a. **Legal framework and standard of review**

"When a jury asks a question after retiring for deliberation, '[s]ection 1138 imposes upon the court a duty to provide the jury with information the jury desires on points of law.' " (*People v. Eid* (2010) 187 Cal.App.4th 859, 881-882.) We review the trial court's failure to adequately answer a jury inquiry for an abuse of discretion. (*People v. Hodges* (2013) 213 Cal.App.4th 531, 539.)

---

[5] The People note that "[t]he precise time of a crime need not be declared in the accusatory pleading." (*People v. Wrigley* (1968) 69 Cal.2d 149, 155.) However, here the prosecutor charged defendant for crimes committed during specified time periods.

### b. **The Bates Interview and the Jury's Question**

Victim testified that she was interviewed by a female employee at the Bates-Eldredge Clinic about the incidents with defendant. However, there were some discrepancies between the Bates interview and her testimony at trial, and she was unable to recall some of the details of what she had told the interviewer. On cross-examination she was unable to recall if she told the interviewer about her pregnancy scare or that she had sex with defendant in the living room and dining room of the house. Victim later said she told the employee at the Bates clinic that her pregnancy scare was due to her having sex with defendant. Victim testified that she felt more comfortable during the interview at the Bates clinic. Neither a transcript nor a report of the Bates interview was ever introduced into evidence by either the People or by the defendant.

However, presumably because the interview was discussed during victim's testimony, the jury asked the court about the Bates interview twice, once during the trial and once during its deliberations. The first time, the jury sent a note to the court during victim's testimony asking, "Will the Report from the BATES Clinic be part of the evidence? If not, can we know why not?" The court answered, "We received a note from one of the jurors about the Bates clinic report, and I've shown this to the attorneys, and if the attorneys conclude that there's anything relevant in that Bates report, they'll make sure that evidence gets before the jury. But I did share the note with both counsel."

The second time, the jury submitted a written question to the court during deliberations, asking, "The Bates Interview--its [*sic*] referenced several times but we were not provided any information--would this interview be relative [*sic*]?"

This time, the court conferred with counsel outside the presence of the jury about the question regarding the Bates interview. The court explained that it believed it "would be best to bring [the jury] in to tell them that it [the Bates interview] wasn't placed in evidence and not to speculate about it, whatsoever." Counsel agreed.

13

When the jury was brought in, the court stated: "We received a note. The Bates interview, it's referenced several times, but we will not provide any information with the interview be relative [*sic*]. That question was asked, probably, by you early on, and both the attorneys felt there wasn't anything relevant in there, or they would have brought it before us. So it's not in evidence, and you can't consider that or speculate what's in that. And so I wanted to directly tell you that."

Defendant now argues that the trial court's answer misled the jury by asserting that the interview was not relevant.

### c. **Forfeiture**

First, the People argue that defendant has forfeited this argument, because his defense counsel tacitly approved the trial court's answer to the jury.

"A defendant may forfeit an objection to the court's response to a jury inquiry through counsel's consent, or invitation or tacit approval of, that response. [Citations.] But this rule obviously cannot apply unless it appears that counsel was aware of the court's response at before the time it was effected. 'Tacit approval' of the court's response, or lack of response, may be found or where the court makes clear its intended response and defense counsel, with ample opportunity to object, fails to do so. [Citation.] At its furthest reach the rule has been held to justify a forfeiture where defense counsel sat mute while the court provided a response later challenged on appeal." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1048.)

Here, the court informed defendant's counsel that it was going to instruct the jury that the Bates interview was not placed into evidence and to not speculate about its contents. However, in responding to the jury's question, the court stated that there was nothing "relevant" in the interview. Defense counsel did not tacitly or expressly approve of the court's explanation to the jury about the relevancy of the Bates interview. Nor did

14

defense counsel have advance notice of the court's statement.  Accordingly, no forfeiture occurred.[6]

### d.  **The Court's Answer**

In this context, the trial court's answer to the jury's query regarding whether the Bates interview was "relative" was twofold.  First, it told the jury that there was nothing relevant in the interview, otherwise the attorneys would have introduced it into evidence.  Second, it told the jury that it should not speculate as to the contents of the interview.  Defendant takes issue with the first part of the court's explanation regarding the interview's relevance, particularly because he claims that the Bates interview was especially pertinent to the issue of victim's credibility.  Therefore, defendant insists that the Bates interview fell squarely within the definition of relevant evidence.  (Evid. Code, § 210.)

Preliminarily, we note that the jury's question is ambiguous.  As written, the question stated:  "The Bates Interview--its [*sic*] referenced several times but we were not provided any information--would this interview be *relative* [*sic*]?"  (Italics added.)  It is not particularly clear what the jury meant by asking if the interview was "relative."  Under defendant's interpretation, the jury was inquiring as to whether *any* part of the Bates interview, including the information the jury had received about the interview during victim's testimony and cross-examination, was relevant to the case.  However, the question could also be reasonably interpreted as inquiring into whether the portions of the Bates interview *not* discussed at trial were relevant.

Based on the court's discussion with counsel, it seems that the court believed the jury was inquiring into whether the non-admitted portions of the Bates interview were

---

[6] Based on this conclusion, we need not address defendant's alternative argument that his trial counsel rendered ineffective assistance for failing to ensure the court properly instructed the jury about the Bates interview.

15

relevant. Therefore, in responding to the jury's question, the court asserted that the interview was not "relevant." We do not believe the court meant to erroneously instruct the jury that the references victim made to the Bates interview during her testimony were irrelevant to the case. However, we agree with defendant that the court's answer to the jury could be open for misinterpretation by the jury. (See *People v. Thompkins* (1987) 195 Cal.App.3d 244 [finding that trial court failed to consider what motivated the jury's question].)

Nonetheless, even if the court's answer to the jury was an abuse of discretion, reversal is not warranted unless the error was prejudicial. In order to ascertain if the court's answer was prejudicial, we must first decide whether it is appropriate to review the purported error under the standard set forth under *Watson*, meaning that, absent the error, there was a reasonable probability that defendant would have obtained a more favorable result. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Or, if we should apply the standard of review set forth to claims of federal constitutional error under *Chapman v. California* (1967) 386 U.S. 18, 24. Under the *Chapman* standard, reversal is required unless the error was harmless beyond a reasonable doubt.

Typically, "[s]ection 1138 error due to the trial court's failure to adequately answer the jury's question is subject to the prejudice standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, i.e., 'whether the error resulted in a reasonable probability of a less favorable outcome. [Citation.] In this context, "reasonable probability" means " 'merely a *reasonable chance*, more than an *abstract possibility*,' of an effect of this kind." ' " (*People v. Hodges*, *supra*, 213 Cal.App.4th at p. 539.)

Defendant, however, argues the more stringent *Chapman* standard applies, because the court's answer to the jury inquiry effectively negated a crucial element of his defense. This is because criminal defendants must be afforded, as set forth by the Sixth Amendment and the Due Process Clause of the federal Constitution, a meaningful

16

opportunity to present a complete defense. (*California v. Trombetta* (1984) 467 U.S. 479, 485.)

We disagree with defendant's assertion that *Chapman*'s harmless beyond a reasonable doubt standard should be applied. Even if we were to disregard any mention of the Bates interview, defendant was able to contest victim's credibility at trial through other means. The defense's argument to the jury during closing focused on discrepancies between victim's trial testimony and the information she initially gave to the investigating officers following the incident. In fact, the Bates interview was never specifically mentioned by defense counsel in its closing argument and was not relied on by defense counsel during his argument about victim's credibility. Further, victim's testimony regarding the Bates interview is not entirely probative of her credibility. At trial, victim asserted she could not remember if she told the employee at the Bates clinic about certain aspects of her relationship with defendant. She was not impeached in any way with the contents of the Bates interview during her testimony. Accordingly, we do not believe that the trial court's statement eviscerated or undermined defendant's case to the extent it gave rise to an error of federal constitutional magnitude. Victim's credibility was still an issue that the jury was required to consider.

Therefore, we apply the *Watson* standard of review to defendant's claim, and conclude that there is no reasonable probability that without the purported error, defendant would have received a more favorable outcome. The jury was already presented with evidence that would tend to undermine victim's credibility, such as the inconsistencies between the statements she provided to the officers and her testimony at trial. Furthermore, as we previously stated, the Bates interview itself was not particularly probative of victim's credibility. Though there were slight discrepancies between her trial testimony and the statements she made to the interviewer at the Bates clinic, which

17

were alluded to during cross examination, for the most part victim simply asserted that she could not recall the exact details of what she said during the Bates interview.

Furthermore, there was strong evidence of defendant's guilt. The People introduced into evidence the tape recording of the 911 call made by mother, where she described that she had found victim naked in the room with defendant. Victim herself testified at length regarding the crimes committed by defendant throughout the years.

Additionally, there was evidence that undermined defendant and mother's credibility. Although defendant resided with victim for years, he denied ever being alone in the house with her. He also testified at trial that he and mother never showered alone and always showered together. These assertions strain credulity. Further, mother initially asserted in her 911 call and her statements to detectives that she had found victim naked in the room with defendant, who was also standing in victim's room. Later, at trial, she contradicted her earlier statements and testified that she had found victim partially dressed, and defendant was not in victim's room but was standing on the ladder outside victim's window.

For the foregoing reasons, we find that even if the court's statement to the jury was made in error, the error does not warrant reversal of defendant's convictions.

3. *The New Trial Motion*

Finally, defendant argues the court abused its discretion when it denied his motion for a new trial without hearing testimony from victim, who had submitted a one-page letter recanting her allegations following the jury's verdict.

a. **Legal Framework and Standard of Review**

Under section 1181, a trial court may grant a new trial upon newly discovered evidence. "In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidenced be not cumulative merely; 3.

18

That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' " (*People v. Turner* (1994) 8 Cal.4th 137, 212.)

The determination of a motion for a new trial rests so completely within the trial court's discretion that its decision will not be disturbed on appeal unless a manifest and unmistakable abuse of discretion appears. (*People v. Davis* (1995) 10 Cal.4th 463, 524.)

The credibility of the newly discovered evidence supporting a motion for new trial is relevant to the trial court's determination. (*People v. Delgado* (1993) 5 Cal.4th 312, 329.) "In this state, it is settled that the offer of a witness, after trial, to retract his sworn testimony is to be viewed with suspicion." (*In re Weber* (1974) 11 Cal.3d 703, 722.)

b. **Application to Defendant's Case**

Here, defendant argues that the trial court abused its discretion when it denied his new trial motion without eliciting testimony from victim. We disagree.

First, "[i]t has long been recognized that 'the offer of a witness, after trial, to retract his sworn testimony is to be viewed with suspicion.' " (*In re Roberts* (2003) 29 Cal.4th 726, 742.) "The role of the trial court in deciding a motion for new trial based upon a witness's recantation is to determine whether the new evidence is credible, i.e., worthy of belief by the jury. That determination is made after a consideration of all the facts pertinent to the particular issue. The trial court is not the final arbiter of the truth or falsity of the new evidence. [¶] Once the trial court has found the recantation to be believable, it must then decide whether consideration of the recantation would render a different result on retrial reasonably probable." (*People v. Minnick* (1989) 214 Cal.App.3d 1478, 1482.) Therefore, the trial court's first step is to evaluate the recantation to determine whether it is *believable*.

This evaluation need not be based on oral testimony. In fact, on a motion for a new trial, a trial court has the discretion to refuse oral testimony altogether. (*People v. Ferguson* (1932) 124 Cal.App. 221, 229-230.) This is because a new trial is "a reexamination of the issue in the same court, before another jury, after a verdict has been given." (§ 1179.) Therefore, for the most part a motion for a new trial will proceed on affidavits submitted by witnesses "by whom [newly discovered] evidence is expected to be given." (§ 1181, subd. 8.) However, a court does have the discretion to allow oral testimony, which this court declined to exercise based on its determination that victim's letter lacked credibility.

There have been cases where trial courts have been found to have abused their discretion by declining to hear live testimony during a hearing on a motion for a new trial. For example, in *People v. Hairgrove* (1971) 18 Cal.App.3d 606, 610, a defendant brought a new trial motion based on a witness' written declaration claiming to be the perpetrator of the crime of which defendant was convicted. At the hearing on the new trial motion, the witness was present in court and willing to testify regarding the contents of his declaration. However, the trial court dissuaded him from testifying and denied the motion for the new trial on the ground that defendant had not shown reasonable diligence in attempting to produce the witness at trial. (*Ibid.*) The appellate court reversed and remanded for the trial court to hear the witness' testimony prior to ruling on the motion, finding that the court should have taken advantage of "what purported to be critical new evidence." (*Ibid.*) After hearing the witness' testimony, the trial court would have "all available information before it in ruling on the motion for a new trial." (*Id.* at p. 611.)

In another somewhat analogous situation, the California Supreme Court has held that if a defendant moves for a new trial on the basis of allegations of juror misconduct, "the trial court has discretion to conduct an evidentiary hearing to determine the truth of the allegations." (*People v. Hedgecock* (1990) 51 Cal.3d 395, 415 (*Hedgecock*).)

20

However, a "defendant is not entitled to such a hearing as a matter of right. Rather, such a hearing should be held only when the trial court, in its discretion, concludes that an evidentiary hearing is necessary to resolve material, disputed issues of fact." (*Ibid*.) In *Hedgecock*, the Supreme Court remanded the matter to the trial court to exercise its discretion to determine whether an evidentiary hearing was necessary to resolve the disputed facts regarding the purported juror misconduct. (*Id.* at p. 421.)

The situation outlined in *Hairgrove* is distinguishable in two respects. First, the trial court in *Hairgrove* dissuaded the witness from testifying at the new trial motion. Here, the court did not persuade victim not to testify. Second, the witness seeking to attest to the new material evidence did not testify at trial; therefore, the trial court had no information before it that would assist it in determining the witness' credibility.

Similarly, *Hedgecock* is also dissimilar to this present situation. Although the Supreme Court remanded the matter back to the trial court, this decision was made because the Supreme Court concluded the trial court mistakenly believed it had no authority to hold an evidentiary hearing. (*Hedgecock*, *supra*, 51 Cal.3d at p. 420.) Additionally, the evidence of purported juror misconduct there was not subject to evaluation by the court during the trial itself. Further, *Hedgecock* acknowledged that it was ultimately still within the court's discretion to determine whether an evidentiary hearing is necessary in the first place. (*Id.* at p. 415.) *Hedgecock* did not conclude that a full evidentiary hearing is warranted in every hearing on a new trial motion alleging juror misconduct.

Even without oral testimony at the new trial hearing, the court was able to judge the credibility of victim's recantation. The court had presided over the entirety of the trial and had the opportunity to observe and evaluate victim's credibility based on the contents of her testimony and her demeanor during the trial. Based on its observations, the court noted that victim was obviously "embarrassed" about being a victim of a crime

21

perpetrated by an individual she trusted, her stepfather. Furthermore, the court believed that it was clear from her behavior at trial that she had a difficult time testifying about what transpired during the years of abuse. Based on victim's demeanor during the trial, the court found her testimony to be "completely credible." The court also noted that it believed it was apparent that victim had received pressure from her family after the verdict, since she had been "kicked out of the house." Furthermore, the court found that the letter did not provide additional new information, only that it echoed defendant's testimony at trial that victim was mad at him, giving her a reason to lie about the crimes.

The court concluded it was able to determine the credibility of victim's recantation based on her written letter without first having to hear her testify at the hearing on the motion, because it had found her trial testimony to be completely believable. We cannot conclude that the court's decision not to require victim's oral testimony at the hearing was so irrational, arbitrary, or capricious to be an abuse of discretion.

c. **Ineffective Assistance of Counsel**

Alternatively, defendant argues that if we do not find the court abused its discretion, his trial counsel rendered ineffective assistance when he failed to call victim as a witness during the hearing.

"To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. [Citations.] Counsel's performance was deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms." (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 693-694.) However, " '[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there

22

simply could be no satisfactory explanation,' the claim on appeal must be rejected."
(*People v. Wilson* (1992) 3 Cal.4th 926, 936.)

Defendant argues his trial counsel's failure to call victim as a witness during the hearing on the new trial motion fell below an objective standard of reasonableness, because there could be no satisfactory explanation for his behavior. We disagree. Trial counsel could have had a reasonable tactical reason for declining to call victim as a witness at the new trial motion. For example, defendant's trial counsel may have believed that victim would not appear credible on the stand when questioned by the attorneys, or that victim would perhaps reverse her position and deny the contents of the recantation letter.

Defendant has failed to satisfy his burden to show that his trial counsel's performance was deficient. The "record contains no explanation for the challenged behavior" and counsel was not " 'asked for an explanation and failed to provide one.' " (*People v. Kipp* (1998) 18 Cal.4th 349, 367.) We must therefore reject defendant's claim of ineffective assistance of counsel.

### DISPOSITION

The judgment is reversed. On remand, the court shall strike defendant's conviction for count 7 due to insufficiency of the evidence and resentence defendant on the remaining counts.

_____

                          Walsh, J.[*]


WE CONCUR:




_____

      Rushing, P. J.




_____

      Elia, J.




People v. Luna
H040191
_____

   [*] Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.